IN THE COURT OF APPEALS OF NORTH CAROLINA

2022-NCCOA-716

No. COA22-220

Filed 1 November 2022

Alamance County, No. 18CRS056582

STATE OF NORTH CAROLINA

v.

ERIC DOUGLAS MOORE

Appeal by Defendant from judgment entered 24 May 2021 by Judge David T. Lambeth, Jr., in Alamance County Superior Court. Heard in the Court of Appeals 4 October 2022.

*Attorney General Joshua H. Stein, by Special Deputy Attorney General Francisco Benzoni, for the State-Appellee.*

*Appellate Defender Glenn Gerding, by Assistant Appellate Defender Kathryn L. VandenBerg, for Defendant-Appellant.*

COLLINS, Judge.

¶ 1      Defendant Eric Douglas Moore appeals from judgment entered upon a jury verdict of guilty of first-degree murder. Defendant contends that his counsel was per se ineffective because he "implicitly admitted [Defendant's] guilt to second-degree murder[;]" that his counsel was prejudicially ineffective because he promised a defense that was not delivered, presented a "pointless" defense witness, and asserted an incoherent defense that conceded guilt without permission; and that the trial court

erred by admitting certain opinion evidence. After careful review, we conclude Defendant did not receive ineffective assistance of counsel and admission of the lay witness opinion testimony did not amount to prejudicial error.

## I. Procedural History and Factual Background

¶ 2      On 17 December 2018, Mary McBroom and her friend Tiyanna Love drove to the Sheetz on Alamance Road to purchase drugs from Defendant. McBroom told Love she intended to pay for the drugs with a "fake 100 dollar bill." Love "had told her not to do it but she was so desperate to do it she did it anyways." McBroom kept her car running while she walked over to Defendant's car to retrieve the drugs. After the purchase, she jogged back to the car and sped off. Defendant was accompanied by Alexxa McKnight, who was in the passenger seat during the transaction. After McBroom left, Defendant looked over at McKnight, "flashed" the money, and said "I think I just got got. This is not real." According to McKnight, Defendant appeared agitated and upset after the transaction.

¶ 3      Shortly after the transaction, McBroom and Love received text messages from Defendant with "[l]aughing emojis and saying, watch this." Defendant called McBroom but she did not answer. Around this time, Defendant called Quiana Miles, McBroom's friend with whom she was staying, via Facebook and told her that he was looking for McBroom because "she had gave him a fake -- some fake money[,]" and that "he didn't play about his money basically." McBroom and Love returned to Love's

boyfriend's house and "chilled until like 3:00 -- like 4:00 or 5:00 in the morning" before McBroom went to Miles' residence on Tucker Street, where she was staying.

¶ 4    Between 4:04 A.M. and 4:21 A.M., Defendant and McBroom exchanged a series of text messages in which McBroom acknowledged that she owed Defendant money, Defendant asked when she would have it, and McBroom replied that she would try and donate plasma.  From approximately 4:22 A.M. to 5:51 A.M., McBroom called Defendant 22 times attempting to meet up with him.  Defendant told McKnight and her boyfriend, Laking Crews, that he wanted to go to Tucker Street Apartments to "pick something up."  Shortly after McKnight backed into a parking spot at Tucker Street, "somebody approached the back of the car on [Defendant's] side."  McKnight heard a short span of dialogue and then a gunshot.  McKnight was startled and drove away.  After driving a short distance, Defendant told McKnight to "stop and get the 'F' out of the driver's seat."  Defendant drove to the Short Stop and then his cousin's house before he "dropped himself off at home."

¶ 5    At approximately 6:18 A.M., McBroom called the police and reported that she had been shot.  Officers arrived on the scene and found McBroom "laying on their back face up, not moving."  McBroom ultimately died from "a penetrating gunshot wound of the torso."  The autopsy revealed that there was no soot or stippling in the entrance wound, and "[t]here were no other findings that would allow determination of the range of fire."

¶ 6    Defendant was indicted for first-degree murder, and the case proceeded to trial on 18 May 2021. Prior to opening statements and outside the presence of the jury, defense counsel informed the trial court that Defendant planned to concede that he fired the shot that resulted in or proximately caused McBroom's death. Defense counsel also informed the trial court that at some point, he might argue that Defendant was guilty of lesser-included offenses. The trial court conducted a colloquy wherein Defendant indicated that he consented to this strategy.

¶ 7    During opening statements, defense counsel acknowledged that Defendant was a drug dealer and had previously sold drugs to McBroom, that Defendant met with McBroom at Tucker Street Apartments, that McBroom tried to grab drugs out of Defendant's hand and started "wrestling them out of the vehicle[,]" and that Defendant fired a shot that entered McBroom's midsection.

¶ 8    At trial, the State introduced Detective Adam Snow to testify regarding the text messages between Defendant and McBroom before the murder. Over Defendant's objection, Snow testified that, in his experience, it would be easier for somebody to lure a victim by "continu[ing] on the normal path of drug business." During his case-in-chief, Defendant introduced Ramona Rascoe, an evidence technician with the Burlington Police Department. Rascoe testified that a plastic baggie with a white powdery substance was found in the grassy area behind the apartment along the alley. Although Defendant initially intended to testify, he later

invoked his right to remain silent and not testify. When asked whether he spoke with counsel about not testifying, whether he was satisfied with his legal services, and whether the decision was in his best interest, Defendant responded, "[y]es." Thereafter, the defense rested.

During closing arguments, defense counsel argued that the State had not met its burden of proving premeditation and deliberation for first-degree murder. He argued that Defendant did not "express any kind of anger, hatred, ill will, spite," in any of the text messages between Defendant and McBroom, and that Defendant did not have "a premeditated and deliberated plan, to go over there and kill Mary McBroom."

The jury returned a guilty verdict, and Defendant was sentenced to life in prison without parole. Defendant timely appealed.

## II. Discussion

### A. Ineffective Assistance of Counsel

Defendant argues that he received per se ineffective assistance of counsel or, in the alternative, prejudicial ineffective assistance of counsel, in violation of his Sixth Amendment right to counsel.

"The right to assistance of counsel is guaranteed by the Sixth Amendment to the Federal Constitution and by Article I, Sections 19 and 23 of the Constitution of North Carolina." *State v. McNeill*, 371 N.C. 198, 217, 813 S.E.2d 797, 812 (2018)

(citation omitted). "When a defendant attacks his conviction on the basis that counsel was ineffective, he must show that his counsel's conduct fell below an objective standard of reasonableness." *State v. Braswell*, 312 N.C. 553, 561-62, 324 S.E.2d 241, 248 (1985) (citation omitted). Defendant must satisfy a two-part test to meet this burden:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's error were so serious as to deprive the defendant of a fair trial, *a trial whose result is reliable.*

*Braswell*, 312 N.C. at 562, 324 S.E.2d at 248 (quoting *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). "The fact that counsel made an error, even an unreasonable error, does not warrant reversal of a conviction unless there is a reasonable probability that, but for counsel's errors, there would have been a different result in the proceedings." *Id.* at 563, 324 S.E.2d at 248 (citation omitted).

### 1. *Per se Ineffective Assistance of Counsel*

Defendant first contends that he received per se ineffective assistance of counsel because defense counsel "implicitly admitted Mr. Moore's guilt to second-degree murder."

We review per se ineffective assistance of counsel claims de novo. *See State v.*

*Harbison*, 315 N.C. 175, 337 S.E.2d 504 (1985).

¶ 15        A defendant claiming ineffective assistance of counsel must ordinarily show both that counsel's performance was deficient, and that counsel's deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687. However, "ineffective assistance of counsel, per se in violation of the Sixth Amendment, has been established in every criminal case in which the defendant's counsel admits the defendant's guilt to the jury without the defendant's consent." *Harbison*, 315 N.C. at 180, 337 S.E.2d at 507-08. Statements by defense counsel "must be viewed in context to determine whether the statement was, in fact, a concession of defendant's guilt of a crime[.]" *State v. Mills*, 205 N.C. App. 577, 587, 696 S.E.2d 742, 748-49 (2010) (citation omitted). Where "defense counsel's statements to the jury cannot logically be interpreted as anything other than an implied concession of guilt to a charged offense, *Harbison* error exists unless the defendant has previously consented to such a trial strategy." *State v. McAllister*, 375 N.C. 455, 475, 847 S.E.2d 711, 723 (2020). "[T]he trial court must be satisfied that, prior to any admissions of guilt at trial by a defendant's counsel, the defendant must have given knowing and informed consent, and the defendant must be aware of the potential consequences of his decision." *State v. Foreman*, 270 N.C. App. 784, 790, 842 S.E.2d 184, 189 (2020) (citation omitted).

¶ 16        Here, Defendant consented to counsel's strategy of admitting that Defendant fired the shot that resulted in or proximately caused McBroom's death, and arguing

that Defendant was guilty of lesser-included offenses. Prior to opening statements, the trial court conducted the following colloquy with Defendant regarding trial strategy:

> THE COURT: [Your attorney] has talked to you about this issue. You've prepared your defense and what he's telling me is that you all discussed it and that you've agreed with him that your best strategy in this case is to acknowledge the fact that you did fire the shot but that you did so in self-defense or by accident I think is what [your attorney] said yesterday would be potentially where he sees this evidence going.
>
> And that you don't believe that you're guilty of first degree murder but it's possible that you'd be asking for some this (sic) lesser included offenses when we get to the end of this trial.
>
> Has [your attorney] discussed all of that with you?
>
> DEFENDANT: Yes.
>
> THE COURT: Okay. And do you agree and do you consent that that's a strategy that you'd like to follow to go ahead and admit -- have him admit as early as opening statements that you, in fact, fired the shot even though it wasn't on purpose potentially or it was in self-defense potentially?
>
> DEFENDANT: Yes.
>
> THE COURT: And is that a decision that you make freely, voluntarily and understandingly and of your own free will?
>
> DEFENDANT: Yes.
>
> THE COURT: All right. And do you fully consent to him taking that strategy and going ahead and throughout this trial, again, starting as early potentially as the opening statement, going ahead and letting the jury know those are the facts as you see them?

DEFENDANT: Yes.

THE COURT: Okay.  All right.  Thank you.  You may have a seat.

Because Defendant consented to his counsel's implied concession of Defendant's guilt to second-degree murder, no *Harbison* error exists, and Defendant did not receive per se ineffective assistance of counsel.  *Foreman*, 270 N.C. App. at 790, 842 S.E.2d at 189.

### 2. *Prejudicially Ineffective Assistance of Counsel*

Defendant alternatively contends that he received prejudicially ineffective assistance of counsel because defense counsel promised a defense that was not delivered, presented a "pointless" defense witness, and asserted an incoherent defense that conceded guilt without permission.

"The merits of an ineffective assistance of counsel claim will be decided on direct appeal only when the cold record reveals that no further investigation is required."  *State v. Friend*, 257 N.C. App. 516, 521, 809 S.E.2d 902, 906 (2018) (internal quotation marks and citation omitted).  Here, we address Defendant's ineffective assistance of counsel claim because no further investigation is required to do so.

#### a. *Self-Defense*

Defendant first argues that counsel was prejudicially ineffective because he promised to argue self-defense in opening statements and subsequently failed to do

so. Prior to opening arguments, defense counsel stated to the court:

> Your Honor, at my opening, either whether it's done now or at the State's evidence, and obviously during any closing arguments, we're going to concede that Mr. Moore actually fired the shot that resulted or proximately caused Ms. McBroom's death and I need his consent on the record and permission for me to do that. And at some point I may be arguing obviously for lesser included offenses and I want his consent to do that as well. We've discussed it. He understands that you're going to be asking him questions under oath about that.

Defendant indicated to the court that he consented to this strategy. During opening statements defense counsel stated,

> At that point, Mary McBroom tries to grab the drugs out of Mr. Moore's hand and starts wrestling them out of the vehicle. And as Mr. Moore is trying to get those drugs back from her, she reaches back like she's going to pull something out of her pocket.
>
> Now, Mr. Moore had Laking Crews' .22, pistol in the back seat of the car. He pulls it out and as she's reaching back, makes one shot and it enters her midsection. And at that point, Alexxa McKnight takes off. Mary McBroom walks off. They didn't know if she was hit or what else happened to Mary McBroom. Obviously, Ms. McBroom later calls 911 after the three left the area.

After the State rested, defense counsel indicated to the trial court, "I'll have one short witness and then the defendant is going to testify in the morning." The trial court conducted the following colloquy with Defendant to confirm that he understood his defense:

> THE COURT: [Your attorney] has been representing you

and you've had time to talk to him about your defense and about the different issues in the case, right?

DEFENDANT: Yes, sir.

THE COURT: He's indicating to me that it's your intention as a defendant to put on evidence, number one. And number two, as part of that evidence, actually to testify in your own defense. Is that correct?

DEFENDANT: Yes, sir.

THE COURT: Do you understand that, of course, the law – I'm sure [Your attorney]'s gone over this with you and you've heard me tell the jury this more than several times here this week. The law requires you to put on no defense at all, right? You can sit down and say I'm not saying a word, I'm not putting on any evidence, no defense, no witnesses, nobody, because it's solely the State's burden of proof to prove whether you're guilty or not. You understand all of those things?

DEFENDANT: Yes, sir.

THE COURT: Do you understand that it's your absolute right as a defendant to remain silent and not testify yourself. Do you understand that?

DEFENDANT: Yes, sir.

. . .

THE COURT: And then, secondly, we're not going to get to it this afternoon but I'm expecting tomorrow morning at some point, if you still want to take the stand, that you would be called to the stand by your attorney. Is that what you wish to do?

DEFENDANT: Yes, sir.

THE COURT: And is that – and testify in your own defense?

DEFENDANT: Yes, sir.

THE COURT: Is that a decision that you make freely, voluntarily and understandingly and of your own free will?

DEFENDANT: Yes, sir.

¶ 20 On the final day of trial, however, Defendant decided not to testify, and the trial court conducted the following colloquy with Defendant:

> THE COURT: All right. I've had a pretrial conference this morning. Not pretrial. Pre-session conference this morning with the attorneys. And [your attorney] informed me, Mr. Moore, that upon reflection and upon meeting last night with [your attorney] and, again, confirming this morning with him, that you decided not to testify. Is that correct?
>
> DEFENDANT: Yes, sir.
>
> . . .
>
> THE COURT: Okay. So we went through a colloquy yesterday about – dialogue yesterday, and you told me you understood you had the right to remain silent, you understood you didn't have to call any witnesses but you were going to do so anyway and understood you had the right to testify or not to testify. That is your absolute right under the Constitution of the United States. You understand all of that?
>
> DEFENDANT: Yes.
>
> THE COURT: You told me yesterday that you had decided, and talked to [your attorney] all along about all of this, but you had decided to testify yesterday and it's my understanding now you changed your mind and decided to invoke your right to remain silent and not testify. Is that correct?
>
> DEFENDANT: Yes.

¶ 21 Defendant endorsed the strategy used by defense counsel by expressing to his counsel, which he acknowledged on the record, that he consented to counsel putting on a self-defense defense, which included admitting that he fired the fatal shot, and

that he intended to testify in his own defense. Defendant cannot now be heard to complain that this strategy was ineffective.

### b. *Witness Testimony*

¶ 22     Defendant next contends that counsel was prejudicially ineffective because he called only one witness "whose testimony was pointless." Roscoe's testimony revealed that a plastic baggie containing a white powdery substance was discovered near the scene but was not tested in any way. Roscoe's testimony was not "pointless" because it showed potential shortcomings in processing the crime scene in that the substance was not tested for fingerprints or otherwise. *See State v. Brindle*, 66 N.C. App. 716, 718, 311 S.E.2d 692, 693-94 (1984) ("Ineffective assistance of counsel claims are not intended to promote judicial second-guessing on questions of strategy and trial tactics."). Therefore, defense counsel's presentation of evidence was not deficient and did not amount to ineffective assistance of counsel.

### c. *Closing Argument*

¶ 23     Defendant contends that counsel's closing argument was deficient and prejudicial because it "conceded guilt without permission and . . . did not outline a clear, coherent defense or contention as to verdict." Defendant mischaracterizes the nature of counsel's closing argument. As an initial matter, Defendant previously consented to arguing for lesser included offenses, and counsel's statements during closing argument did not amount to a concession of guilt to second-degree murder.

During closing arguments, counsel argued, inter alia, a lack of premeditation and malice, thereby negating the essential elements of first-degree murder. When discussing the elements of second-degree murder, counsel defined "malice" as

> not only hatred, ill will, or spite, as it ordinarily is understood -- to be sure that is malice -- but it also means that condition of the mind which prompts a person to take the life of another intentionally or to intentionally inflict serious bodily harm which proximately results in another's death without just cause, excuse or justification.

Defense counsel argued,

> when you consider all the evidence that you've heard, that the most that you could find Mr. Eric Moore guilty of in this particular case is second degree murder upon a finding of malice.
>
> And, again, you've not been presented any witnesses from the State that actually saw the exchange that went on between those two that led up to this. Didn't have somebody that saw that. And the State obviously can prove their case and the judge will instruct you about circumstantial evidence but I'm arguing to you that that doesn't mean that you fill in a lot of gaps with what you think or speculate as to exactly what happened because anybody charged with a crime is due the benefit of any reasonable doubt that you might have.

Defendant contends that, instead of this strategy, counsel could have "(1) explicitly argued for a not guilty verdict based on the State's failure to prove who the shooter was given Mary's statement ('I don't know' who shot me), the texts, the physical evidence, and the witnesses who were clearly hiding something; or (2) explicitly argued (with consent) for a second-degree verdict." However, we are not in a position

to "second-guess counsel's assistance after conviction or adverse sentence . . . [and] a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *State v. Smith*, 241 N.C. App. 619, 629-30, 773 S.E.2d 114, 121 (2015) (quoting *Strickland*, 466 U.S. at 689). We conclude that defense counsel presented a coherent closing argument to negate the elements of first-degree murder, and Defendant did not receive ineffective assistance of counsel. *Braswell*, 312 N.C. at 562, 324 S.E.2d at 248.

**B. Opinion Evidence**

¶ 24        Lastly, Defendant argues that the trial court erred by admitting Snow's opinion testimony and that without his testimony, "there is a reasonable possibility the defense could have convinced the jury there was doubt as to both first- and second-degree murder."

¶ 25        "We review a trial court's ruling on the admissibility of lay opinion testimony for abuse of discretion." *State v. Belk*, 201 N.C. App. 412, 417, 689 S.E.2d 439, 442 (2009) (citation omitted).

¶ 26        Lay witness opinion testimony is "limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue." N.C. Gen.

Stat. § 8C-1, Rule 701 (2021). "In determining whether a criminal defendant is prejudiced by the erroneous admission of evidence, the question is whether there is a reasonable possibility that, had the evidence not been admitted, the jury would have reached a different verdict." *State v. Malone-Bullock*, 278 N.C. App. 736, 2021-NCCOA-406, ¶ 27 (citation omitted).

¶ 27 During Snow's testimony, the following colloquy took place:

> STATE: Regarding the discussions that occurred between Mr. Moore and Ms. McBroom after the incident at Sheetz, in your experience, would it be easier or more difficult for somebody to lure their victim to them by threats or by promises?
>
> DEFENSE: Objection.
>
> THE COURT: Overruled.
>
> SNOW: It would [be] easier to continue on the normal path of drug business. So if I'm trying to recontact somebody I had done a previous deal with, then I would continue business as usual if I want to make another attempt to contact that user.
>
> STATE: So when Ms. McBroom contacted Mr. Moore around 4:07 or afterwards that evening, had Mr. Moore said, I'm going to kill you, it's unlikely that Ms. McBroom would have made herself available to the defendant?
>
> DEFENSE: Objection.
>
> THE COURT: Overruled.
>
> SNOW: Correct.

¶ 28 Even if the testimony was erroneously admitted, its admission does not amount to prejudicial error. The State did not refer to Snow's testimony during

closing arguments, but rather alluded generally to the commonsense notion that:

> If he had said, Mary, I'm going to get you; Mary, I'm going to kill you; I'm coming for you Mary, Mary would have ducked and run. She would have covered. She would have found something to do. She would have got out of the way.
>
> He lured her into a false sense of security. Hey, we're good. I got your back. You don't have somebody's back. You don't want to front somebody -- you're not going to front somebody anymore money when they've already stolen the drugs from your hand and ripped you off. He plays the friend card. He plays that game so that she'll come to him. And she did.

Thus, Defendant has failed to show a reasonable possibility that the jury would have reached a different verdict absent Snow's testimony. *Malone-Bullock*, 278 N.C. App. 736, 2021-NCCOA-406, ¶ 27.

## III.     Conclusion

¶ 29          Defendant did not receive ineffective assistance of counsel and admission of Snow's opinion testimony was not prejudicial error.

NO ERROR IN PART; NO PREJUDICIAL ERROR IN PART.

Judges TYSON and INMAN concur.